1  David Barron, Esq.
   Nevada Bar No. 0142
2  Chelsea Pyasetskyy, Esq.
   Nevada Bar No. 11688
3  **BARRON & PRUITT, LLP**
   3890 West Ann Rd.
4  North Las Vegas, Nevada 89031
   Telephone: 702-870-3940
5  Facsimile:  702-870-3950
   Email:  dbarron@lvnvlaw.com
6  cpyasetskyy@lvnvlaw.com
   *Counsel for United Artists Theatre Circuit, Inc.*
7

8              **UNITED STATES DISTRICT COURT**

9                **CLARK COUNTY, NEVADA**

10                        ***

11  THOMAS JACKSON, an Individual,
    CAROL JACKSON, an Individual,        Case No.:   2:10-CV-00050-LDG-GWF
12
                                         **DEFENDANT UNITED ARTISTS THEATRE**
13            Plaintiffs,                **CIRCUIT, INC.'S MOTION FOR SUMMARY**
                                         **JUDGMENT**
14  v.

15  UNITED ARTISTS THEATRE CIRCUIT,
    INC., a Maryland Corporation doing
16  business as UA RAINBOW
    PROMENADE; DOES I through X,
17  inclusive and ROE CORPORATIONS XI-
    XX, inclusive
18
              Defendants.
19

20      Defendant UNITED ARTISTS THEATRE CIRCUIT, INC. (hereinafter "Defendant"),  by

21  and through its attorneys, Barron & Pruitt, LLP, hereby submits the instant Motion for Summary

22  Judgment pursuant to Federal Rules of Civil Procedure ("FRCP") 56(c).  This Motion is

23  supported by the attached memorandum of points and authorities, the pleadings and papers on file

24  herein, and any other evidence and oral argument this Court may entertain at the hearing of this

25  motion.

26  / / /

27  / / /

28  / / /

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PREFATORY STATEMENT

Plaintiffs Carol Jackson and her husband Thomas Jackson commenced this negligence action for injuries[1] sustained by Plaintiff Carol Jackson after allegedly slipping and falling on an "unknown liquid substance" at the United Artists' Rainbow Promenade Theatres (hereinafter "Rainbow Promenade") in Las Vegas on February 29, 2008. The fall supposedly took place as Plaintiffs were finding their seats before the second showing of *No Country for Old Men.* After her fall, neither Mr. Jackson nor Mrs. Jackson saw or felt anything on the floor. Despite falling, Mrs. Jackson stayed and watched the entire movie—only reporting her alleged fall over two hours later. After the Jackson's reported the fall, theater employees went into the theater and inspected the area where the Jacksons said the fall occurred. The employees also did not find any substance on the floor in the area where Mrs. Jackson claims she fell.

The instant motion is brought not only because Plaintiffs have failed to establish that a dangerous condition existed at the time of Mrs. Jackson's fall, but also because Plaintiffs can present no evidence that United Artists had actual or constructive notice of any dangerous condition prior to Mrs. Jackson's fall. United Artists has rigorous protocols and procedures for cleaning and maintaining its theaters. As discussed in detail below, all the auditoriums are inspected prior to opening; inspected and cleaned between each showing, even if no tickets are purchased for the showing; theater checks are conducted at least twice during a show; and a thorough cleaning is done every evening after closing by an outside janitorial service. Plaintiffs

---

[1] Although not the subject of the instant motion, Mrs. Jackson has a long history of medical conditions. In 1985, she was diagnosed with Multiple Sclerosis—"a chronic, frequently progressive inflammatory disease of the central nervous system…" *Injurious Falls Among Middle Aged and Older Adults With Multiple Sclerosis*, Elizabeth W. Peterson, MPH, OTR/L, et. al., Arch Phys. Med. Rehabil. Vol. 89, June 2008, 1031, attached hereto as **Exhibit A.** Due to her debilitating MS, she retired from her position as Director of the Nevada Department of Employment, Training, and Rehabilitation Division on June 22, 2000.

Mrs. Jackson also has a history of falling, including falls at a hotel in New Orleans (date unknown); on a sidewalk in Santa Barbara (date unknown); a trip over a box, for which she injured her back and filed a worker's compensation claim in 1987; a slip and fall at a PF Chang restaurant (date unknown); and a trip at her home over pool equipment in February 2007. *See* Deposition of Carol Jackson, 60:18-25, 61:1-25, 62:1-25, 63:1-8, 115:18-25, 116:1-24, attached hereto as **Exhibit B** (Only exhibits A and B of deposition included). Mrs. Jackson was also in at least three prior motor vehicle accidents in which she claimed back and neck injuries—including one on November 30, 2007, only months prior to the theater incident and for which she was still treating at the time of the subject fall.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

1  can present no evidence that United Artists' protocols and procedures were inadequate or not

2  followed on February 29, 2008.

3       Discovery in this case is closed. Defendant United Artists brings the instant motion

4  because: 1) Plaintiffs cannot prove at trial that a dangerous condition existed in the theater; and 2)

5  Plaintiffs cannot prove at trial that United Artists created the dangerous condition or had actual or

6  constructive knowledge of the condition prior to Mrs. Jackson's alleged fall. As such, there is no

7  genuine fact left for trial that allows Plaintiffs to recover and United Artists respectfully requests

8  this Court grant the instant Motion for Summary Judgment.

9

10  ## II. STATEMENT OF UNDISPUTED FACTS

11  **A.  The Subject Incident**

12       For purposes of this Motion, the undisputed facts regarding the alleged incident are set

13  forth below:

14     1.  On February 29, 2008, Plaintiffs, along with Mr. Jackson's father, Thomas J. Jackson,

15        Sr., went to the United Artists Rainbow Promenade theater to watch the film, "No

16        Country for Old Men," screening in Auditorium 7 at 4:20 p.m.[2]

17     2.  The Rainbow Promenade had four screenings of *No Country for Old Men* on February

18        29, 2008: 1:30 p.m., 4:20 p.m., 7:10 p.m., and 9:55 p.m. Fifteen people purchased

19        tickets to the first show; ten (including the three Jacksons) to the second; fourteen to

20        the third; and five to the last.[3]

21     3.  Prior to entering Auditorium 7, the Jacksons purchased unbuttered popcorn at the

22        concession stand and Mrs. Jackson grabbed an empty cardboard drink tray to put

23        popcorn in for Mr. Jackson, Sr.[4]

24

---

25  [2] Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:1–10, attached hereto as **Exhibit C.**

26  [3] Regal Showtime Summary for February 28th and 29th, 2008, Bates Numbered REGAL 004106, attached hereto as **Exhibit D.**

27  [4] Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:1–13, Exhibit C. Please also see the Incident

28  Report, attached as **Exhibit Q.**

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

4. The Jackson party entered Auditorium 7 sometime during the "twenty"—the twenty minutes of commercial previews prior to the movie previews starting.[5]

5. The movie theater was relatively empty, with only a few other people towards the front of the theater and Mr. Jackson led his father and Mrs. Jackson to an empty row of seats toward the back of the auditorium.[6]

6. Mr. Jackson, followed by his father, entered the row from the left of the theater (when facing the screen) and moved towards seats near the center.[7]

7. Mrs. Jackson wanted to sit next to her husband, so she entered the seating row above where Mr. Jackson was sitting and walked to the opposite side of the row.[8]

8. Mrs. Jackson held the cardboard tray in one hand and her purse in the other when she entered the seating row where her husband was sitting.[9]

9. Mrs. Jackson walked towards the middle of the eight-seat row and was at least 2-3 seats towards the middle.[10]

10. Mrs. Jackson extended the cardboard tray in her right hand for Mr. Jackson to take and give to his father, with her back facing the movie screen, although she does not recall if he took the tray or not.[11]

11. At the same time, Mr. Jackson was assisting his father in getting to and sitting in his seat.[12]

---

[5] Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:14–16, Exhibit C. Deposition of Amber Mason, 47:23-25, 48:1-4, attached hereto as **Exhibit E.**

[6] Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:16–17, Exhibit C. Deposition of Thomas Jackson, 13:9–21, attached hereto as **Exhibit F** (only exhibit G of deposition included); Deposition of Scott Rowe, 18:10–12; 34:20, attached hereto as **Exhibit G.**

[7] Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:16–17, Exhibit C.

[8] Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:17–18, Exhibit C.

[9] Deposition of Carol Jackson, Vol. I, 100:7–25; 101:1–10, Exhibit B; Deposition of Amber Mason, 14:13–21, Exhibit E.

[10] Deposition of Carol Jackson, Vol. I, 102:2-9, Vol. II, 123:23-25, 124:1, Exhibit B. Deposition of Thomas Jackson, 18:24-25, 19:1-8, 13, 17, Exhibit F.

[11] Deposition of Carol Jackson, Vol. I, 104:19-25, 105:4–6, Exhibit B; *see also* Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:20–21, Exhibit C.

[12] Deposition of Carol Jackson, Vol. I, 103:20–25; 104:1–3, Exhibit B; Deposition of Thomas Jackson, 14:15-18, Exhibit F.

12. Mrs. Jackson, who was wearing flat heeled shoes, claims she turned counterclockwise, toward the movie screen, to sit in her seat, but did not cross one foot over the other in the act of turning.[13]

13. She did not reach back to pull the seat down.[14]

14. Mrs. Jackson claims that as she turned, she fell, landing on her tailbone first, then on her shoulder and right side before hitting her arm and head.[15]

15. Mrs. Jackson claims she came to rest on the floor with her head toward Mr. Jackson and feet toward the aisle entrance she had just used.[16]

16. Mr. Jackson did not see Mrs. Jackson fall.[17]

17. After she fell, Mrs. Jackson claims she stayed laying on the floor for a few minutes before Mr. Jackson helped her into her seat.[18]

18. Mrs. Jackson remained in her seat and watched the entire film.[19]

19. Plaintiffs did not observe anything on or about the floor at the time Mrs. Jackson fell. Specifically:

    Q.    Sure.  There was no noticeable spill?  In other words, you didn't see--

    A.    No.  No.  No.  I did not see anything.

    Q.    Anything.  Okay.

    A.    No.

    Q.    And that would include any sort of discoloration --

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

---

[13] Deposition of Carol Jackson, Vol. I, 105:22–25, 106:1–6, Vol. II, 117:3–25, 118:1–20, Exhibit B.

[14] Deposition of Carol Jackson, Vol. I, 105:13–14, 106:7–9, Exhibit B.

[15] Deposition of Carol Jackson, Vol. I, 104:12–16; Vol. II, 128:9-19, Exhibit B; *see also* Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:21–24, Exhibit C.

[16] Deposition of Carol Jackson, Vol. II, 129:24–25; 130:1–20, Exhibit B; Deposition of Thomas Jackson, 14:23-25, 15:1, Exhibit F; *see also* Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:21–24, Exhibit C.

[17] Deposition of Thomas Jackson, 14:15-18; 17:8–14, Exhibit F.

[18] Deposition of Carol Jackson, Vol. II, 133:17–25; 134:1–25; 135: 1–7, Exhibit B; *see also* Plaintiff Carol Jackson's Responses to Defendant's Interrogatories, 2:26–28, Exhibit C; Deposition of Thomas Jackson, 15:13-16, Exhibit F.

[19] Deposition of Carol Jackson, Vol. II, 133:24–25; 135:1–2, Exhibit B Deposition of Amber Mason, 47:15–25; 48:1–21, Exhibit E.

1    A.     No.

2    Q.     -- on the floor?

3    A.     No, I did not see anything.

4    Q.     Nothing at all?

5    A.     No. [20]

6   20. After she fell, Mr. Jackson did not inspect the floor.[21] After the film concluded

7      approximately two hours later[22], the Jackson party exited Auditorium 7 and reported

8      the incident to a United Artists' manager.[23]

9   21. On information and belief, this manager was the usher manager Archie Gatbonton[24],

10      who then reported it to an associate manager, Scott Rowe. Mr. Rowe notified the other

11      associate managers on duty, Amber Mason and Crystal Clanton.[25]

12   22. Ms. Mason and Ms. Clanton spoke with Mr. and Mrs. Jackson, filled out the incident

13      report and obtained Mrs. Jackson's information.[26]

14   23. During this interview, Mrs. Jackson gave them an attorney's business card.[27]

15   24. Mrs. Jackson refused medical assistance offered by employees and instead said she

16      had a clinic she went to and she would go there to make sure nothing was wrong

17      because she had other conditions.[28]

---

[20] Deposition of Carol Jackson, Vol. II, 136:23–25; 137:1–9, Exhibit B.

[21] Deposition of Thomas Jackson, 19:17-22, 20:1, Exhibit F.

[22] Deposition of Amber Mason, 19:20-25; 20:1–19, Exhibit E.  Defendant requests the Court take judicial notice pursuant Federal Rules of Evidence, Rule 201(b) that *No Country for Old Men* has a 122 minute runtime. *See* http://www.imdb.com/title/tt0477348/

[23] Deposition of Thomas Jackson, 15:24–25, 16:1-3, Exhibit F; Incident Report, Exhibit Q.

[24] During discovery, Defendant's counsel notified Plaintiffs that Mr. Gatbonton was a witness, that he took the photograph, and that he was hearing impaired and required a translator. Further, in Defendant's Answers to Interrogatories, attached as Exhibit K, state that Mr. Gatbonton conducted the inspections on February 29, 2008 prior to the alleged fall. *See* Answer to Interrogatory No. 21. Nonetheless, Plaintiffs never noticed Mr. Gatbonton's deposition during discovery, nor did they request an extension to take his deposition—despite filing numerous motions to extend discovery for other reasons. Thus, the photograph contains inadmissible hearsay if it is attempted to be admitted for the proposition that it depicts that there was a foreign substance on the floor. *See* Federal Rules of Evidence, Rule 801(c) and Rule 802.

[25] Deposition of Scott Rowe, 11:3–13, Exhibit G; Deposition of Amber Mason, 9:19–25, Exhibit E.

[26] Deposition of Amber Mason, 10:1–25, 13:11-25, 14:1-25, 15:1-25, Exhibit E.

[27] Deposition of Amber Mason, 11:1–21, 36:1-25, 38:13–20, Exhibit E.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN ROAD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

25. Mr. Rowe and Mr. Gatbonton returned to Auditorium 7 with Mr. Jackson, who pointed out where Mrs. Jackson says she fell.[29]

26. Mr. Rowe claims he got on his hands and knees and felt the entire floor surface where Mrs. Jackson fell.[30]

27. Mr. Rowe claims he did not feel any debris, butter, oil, or other substance nor did he observe anything in or around the area where Mrs. Jackson fell.[31]

28. A photograph of the area was taken and according to Mr. Rowe and Mr. Amico, such photograph was taken by Mr. Gatbonton with his cell phone and labeled the area "Slip and fall (Butter)".[32]

29. During this time, Mr. Jackson also did not observe anything on the floor:

> Q.    Did you notice any debris on the floor?
>
> A.    No, I did not.
>
> Q.    Did you yourself see anything?
>
> A.    No, I did not.
>
> Q.    Did you inspect it and get down with your hand and just touch it and see if there was anything there?
>
> A.    No, I did not. [33]

30. Later that evening, Rainbow Promenade's General Manager Jeff Amico conducted a general inspection of Auditorium 7 and again found no problems with the floor.[34]

---

[28] Deposition of Amber Mason, 13:21–24; 36:1–25, 37:1-3, 38:13-15, Exhibit E; Crystal Clanton, 21:15-19, Exhibit H.

[29] Deposition of Scott Rowe, 16:4–6, 45:7–13, 50:19–25, 51:1–25, 52:1–23, Exhibit G; Deposition of Thomas Jackson, 16:4-6, Exhibit F.

[30] Deposition of Scott Rowe, 13:9-15, 14:5–21, 22:11–25, 23:1-4, 23:17–20, 33:7–12, 36:22–25, 37:1–22, 40:8–12, 42:24–25, 43:1–25, 44:1–4, 54:5–13, Exhibit G

[31] Deposition of Scott Rowe, 14:5–21; 37:1–22; 42:24–25; 43:1–25; 44:1–4.

[32] The photograph has been authenticated by Jeff Amico as the photograph that was sent to him following the incident, *see* deposition testimony at 18:15-25, 19:1-5, attached as **Exhibit I**; Deposition of Scott Rowe, 15:9-14, 41:19-24, Exhibit G; *see also,* the subject photograph, attached as **Exhibit J**. As discussed above, Plaintiffs never took Mr. Gatbonton's deposition during discovery. Thus, the photograph contains inadmissible hearsay. *See* Federal Rules of Evidence, Rule 801(c) and Rule 802.

[33] Deposition of Thomas Jackson, 24:6–12, Exhibit F.

[34] Deposition of Jeffrey Amico, 12:19–25; 13:1–16, Exhibit I.

31. None of United Artists' employees had notice of any butter or oil in the area of Mrs. Jackson claims she fell prior to her alleged fall.[35]

**B.      United Artists' Auditorium Cleaning Protocols**

United Artists no longer owns or operates the Rainbow Promenade theater and sold it to AMC in June 2010. For purposes of this Motion, the undisputed facts regarding United Artists' protocols and procedures for cleaning the auditoriums before the incident and prior to selling the theater are set forth below:

1. Every evening after the theater closed, a janitorial service, Master Janitorial, did a thorough cleaning of the theater.[36]

2. The janitorial service inspected and cleaned the auditoriums, the hallways, bathrooms, and lobby to ensure the theater was ready for opening the following morning.[37]

3. In the mornings prior to opening, the opening manager would conduct a "Daily Inspection Report," which included walking the building and inspecting all the auditoriums, hallways, bathrooms, and lobby to ensure the nightly janitorial service properly cleaned and to ensure there were no safety issues with the building that needed to be addressed.[38]

4. If the opening manager saw any problems with the janitorial services' work, the opening manager would contact the theater's general manager, Jeff Amico, so he could contact the janitorial service.[39]

5. During hours of operation, the theater auditoriums were cleaned in between each showing by ushers.[40]

---

[35] Deposition of Scott Rowe, 40: 17–22, Exhibit G.

[36] Deposition of Scott Rowe, 18:20-22, 19:6-8, Exhibit G; Deposition of Jeff Amico, 16:2-4, 13-14, Exhibit I; Deposition of Amber Mason, 30:9-12, Exhibit E; Defendant's Answers to Interrogatories, No. 4, Exhibit K.

[37] Deposition of Jeff Amico, 16:5-9, Exhibit I.

[38] Deposition of Jeff Amico, 24:17-22, Exhibit I; Deposition of Amber Mason, 30:9-12, Exhibit E; *see also* "Usher Certification: Training Program & Certification for the Regal Entertainment Group," REGAL004081, attached hereto as **Exhibit L.**

[39] Deposition of Jeff Amico, 24:23-25, 25:1-4, Exhibit I.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

6. The ushers had schedules of when each movie concluded so they can immediately clean the auditoriums. Once it concluded, the usher waited for all patrons to exit the auditorium, although if people were still in the theater, the usher asked them to leave while the auditorium was cleaned.[40].

7. Once all customers were outside the auditorium, the usher turned on additional "usher" lights to conduct a thorough inspection of the entire theater.[42]

8. Initially, the usher walked through the theater and picked up and threw away large items, such as cups or popcorn buckets.[43]

9. The usher walked up and down all of the rows with a dust pan and broom to ensure the auditorium was clean and to inspect for any safety issues, spills or damages items that needed to be addressed.[44]

10. If there was a small spill, the usher may just use paper towels to clean the spill.[45]

11. If there was a large wet spill, the usher would first use a wet mop to clean the area and then use a dry mop to dry the area.[46]

12. If there was a large wet spill, the usher may notify management because the spill may take additional time to clean.[47]

13. The floor was dry prior to allowing patrons in for seating.[48]

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN ROAD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

---

[40] Deposition of Scott Rowe, 18:16-22, 38:3-9, Exhibit G; Deposition of Amber Mason, 42:6-25, 43:1, Exhibit E.

[41] Deposition of Scott Rowe, 38:5-9, Exhibit G; Deposition of Jeff Amico, 15:6-10, 26:4-8, Exhibit I; Deposition of Amber Mason, 18:14-18, Exhibit E.

[42] Deposition of Scott Rowe, 38:18-21, Exhibit G; Deposition of Jeff Amico, 26:9-16, Exhibit I; Deposition of Crystal Clanton, 13:2-6, Exhibit H; Deposition of Amber Mason, 28:7-13, Exhibit E.

[43] Deposition of Crystal Clanton, 13:7-8, Exhibit H; Deposition of Amber Mason, 18:19-22, Exhibit E.

[44] Deposition of Scott Rowe, 38:21-25, Exhibit G; Deposition of Jeff Amico, 15:6-16, 26:9-16, Exhibit I; Deposition of Crystal Clanton, 13:7-15, Exhibit H; Deposition of Amber Mason, 18:20-25, 19:1-3, Exhibit E; see also "Usher Certification: Training Program & Certification for the Regal Entertainment Group," REGAL004090-REGAL004091, Exhibit L.

[45] Deposition of Scott Rowe, 39:3-5, Exhibit G; Deposition of Jeff Amico, 26:20-25, Exhibit I; Deposition of Amber Mason, 43:16-18, Exhibit E.

[46] Deposition of Scott Rowe, 39:2-3, Exhibit G; Deposition of Jeff Amico, 27:8-12, 30:22-24, Exhibit I; Deposition of Crystal Clanton, 13:7-15, Exhibit H; Deposition of Amber Mason, 43:19-25, Exhibit E.

[47] Deposition of Jeff Amico, 27:1-4, Exhibit I; Deposition of Amber Mason, 43:9-13, Exhibit E.

[48] Deposition of Scott Rowe, 39:5-9, Exhibit G; Deposition of Jeff Amico, 27:9-12, Exhibit I; Deposition of Amber Mason, 43:24-25, 44:1-19, Exhibit E.

14. The usher would clean or fix any problem within the theater, unless the usher could not take care of the spill alone, at which point management was notified.[49]

15. Every auditorium was cleaned after every show, even if tickets were not sold to the show to ensure no one went into the auditorium and spilled anything.[50]

16. After the usher finished cleaning the auditorium, the usher notified the ticket taker or doorman that the theater was clean and patrons for the next showing could be seated.[51]

17. The ticket takers were instructed to not take any tickets or let in any patrons until after the usher confirmed the theater was clean.[52]

18. Although there was not a checklist that an usher signed off after he or she cleaned the auditorium, it was standard operating procedure that it was done after every showing.[53]

19. While movies were playing, a "theater checker" came through at least twice and walked up and down the aisle.[54]

20. The theater checker looked around for any problems in the theater and to ensure no one was talking on their cell phones. The theater checker also checked the picture and sound quality.[55]

21. There is no evidence United Artists' employees did not follow the above standard operating procedures for cleaning the theater on the day of the incident.[56]

22. On the day of the incident prior to Mrs. Jackson's fall, the floor manager Amber Mason was not notified of any problems with having to hold back letting guests into the auditoriums due to a spill.[57]

[49] Deposition of Jeff Amico, 15:18-20, 26:17-20, Exhibit I.

[50] Deposition of Jeff Amico, 28:6-12, Exhibit I.

[51] Deposition of Jeff Amico, 28:13-24, Exhibit I; Deposition of Crystal Clanton, 13:16-17, Exhibit H; Deposition of Amber Mason, 20:25, 21:1-5, Exhibit E.

[52] Deposition of Jeff Amico, 28:19-25, 29:1-3, Exhibit I.

[53] Deposition of Jeff Amico, 27:24-25, 28:1-12, Exhibit I; Deposition of Crystal Clanton, Exhibit H, 28:12-18.

[54] Deposition of Scott Rowe, 26:13-25, Exhibit G; Deposition of Jeff Amico, 25:8-21 Exhibit I; *see also* "Usher Certification: Training Program & Certification for the Regal Entertainment Group," REGAL004081 and REGAL004085, Exhibit L.

[55] Deposition of Scott Rowe, 39:19-25, 40:1, Exhibit G; Deposition of Crystal Clanton, 13:22-25, 14:1-2, Exhibit H.

[56] Deposition of Scott Rowe, 40:13-16, Exhibit G; Deposition of Jeff Amico, 29:25, 30:1-12, Exhibit I.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

23. There is no evidence that the theater or Auditorium No. 7 were not properly cleaned on the day of the incident.[58]

24. In the five years prior to Mrs. Jackson's alleged fall, United Artists is only aware of two other alleged slip and falls in its Rainbow Promenade auditoriums, neither of which happened in the seating rows or involved butter or oil:

    1)    3/11/05: While a patron was walking into an auditorium, she stated her feet slid on something and she fell. Although the incident was reported, no claim was made.

    2)    5/15/05: Female was coming out of her movie when she stepped onto the tile from wet carpet her foot went out from under her and she fell. Although the incident was reported, no claim was made.[59]

### III. LEGAL ARGUMENT

#### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v.*

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

---

[57] Deposition of Amber Mason, 44:20-23, Exhibit E.

[58] Deposition of Scott Rowe, 45:21-23, Exhibit G; Deposition of Crystal Clanton, 28:19-25, 29:1-5, Exhibit H.

[59] *See* Defendant's Answers to Interrogatory No. 15, Exhibit K. *See also* Regal Entertainment Group's claim details for the above incidents, previously produced as REGAL004094-REGAL004097, attached hereto as **Exhibit M.**

1    *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  On those issues for which

2    it bears the burden of proof, the moving party must make a showing that is "sufficient for the

3    court to hold that no reasonable trier of fact could find other than for the moving party."

4    *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F.

5    Supp. 2d 1129, 1141 (C.D. Cal. 2001).

6           In order to successfully rebut a motion for summary judgment, the non-moving party must

7    point to facts supported by the record which demonstrate a genuine issue of material fact.  *Reese*

8    *v. Jefferson School Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that

9    might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*,

10   477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute regarding a material fact

11   is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the

12   nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence

13   in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must

14   be evidence on which the jury could reasonably find for the plaintiff.  *Id.* at 252.

15

16   **B.     Negligence Standard**

17          To prevail on a negligence claim, a plaintiff generally must establish, by preponderance of

18   the evidence, that:  (1) the defendant owed a duty of care to the plaintiff; (2) the defendant

19   breached that duty; (3) the breach was the factual cause and proximate cause of plaintiff's injury;

20   and, (4) the plaintiff suffered damages.  *See* Nevada Standard Jury Instruction 3.06; *Doud v. Las*

21   *Vegas Hilton*, 109 Nev. 1096, 1100, 864 P.2d 796, 798 (1993) relying upon *Perez v. Las Vegas*

22   *Medical Center*, 107 Nev. 1, 4, 805 P.2d 589, 590 (1991).  A defendant may defeat a negligence

23   claim by establishing that one of the elements of negligence is not present. *Sims v. General Tele.*

24   *& Elec.*, 107 Nev. 516, 521, 815 P.2d 151, 154 (1991); *see Renaud v. 200 Convention Center,*

25   *Ltd.*, 102 Nev. 500, 501, 728 P.2d 445, 446 (1986).

26   / / /

27   / / /

28   / / /

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

**C.    Plaintiffs Cannot Demonstrate Any Set of Facts that Defendant Breached its Duty of Care.**

Plaintiffs allege Mrs. Jackson's slip and fall was caused by an "unknown foreign substance" on the floor[60] and Defendant United Artists breached its duty of care by failing to warn her of the unsafe condition. A landowner is not an insurer of safety and the mere fact that there was an accident or other event and someone was injured does not raise an inference of negligence. *Gunlock v. New Frontier Hotel*, 78 Nev. 182, 185, 370 P.2d 682, 684 (1962).  Nevada law imposes a duty on landowners to make a property "reasonably safe" for anyone on the premises. *Moody v. Manny's Auto Repair*, 110 Nev. 320, 329, 871 P.2d 935, 941 (1994). However, liability is not predicated on the fact that there was an accident and someone was injured, rather the Plaintiff must establish by substantial evidence that there was negligence. *Gunlock v. New Frontier Hotel Corp.*, 78 Nev. at 185, 370 P.2d at 684 (1962).  Therefore, "in the absence of negligence, there is no liability." *Id*.  *See, Decker v. S.H. Kress Company*, 168 Cal App.2d 365, 335 P.2d 952, 337 P.2d 163 (1959).  Plaintiffs bear the burden to prove the allegations by a preponderance of the evidence. *Holliday v. McMullen,* 104 Nev. 294, 796 P.2d 1179 (1988) (citing *Silver Mining Co. v. Fall*, 6 Nev. 116 (1870)).

Implicit is that land occupiers have a duty to warn those on their property of hazardous conditions that they know of (actual knowledge) or that they should know of (constructive knowledge). *Moody*, 110 Nev. at 329, 871 P.2d at 941. Here, Plaintiffs can point to no evidence that shows that a foreign substance was actually on the floor where Mrs. Jackson fell, and even if they had such evidence, they still have no evidence that Defendant had actual or constructive notice of such condition. Therefore, as Plaintiffs cannot meet their evidentiary burden, Defendant United Artists requests its Motion for Summary Judgment be granted.

/ / /

/ / /

/ / /

---

[60] *See* Plaintiffs' Complaint, attached to Petition for Removal (Document 3).

**1.** **Plaintiffs can present no evidence at trial that a dangerous condition existed at the time of Mrs. Jackson's alleged fall**

Plaintiffs cannot establish that a dangerous condition existed in Auditorium 7 because there is no evidence that a foreign substance was present on the floor where Mrs. Jackson fell.[61] The instant case is similar to *Whiteside v. Movies 10*, where the plaintiff went to a movie at the defendant's theater and in the middle of the movie, got up to use the restroom. 628 So.2d 546 (Ala.1993). As plaintiff "pivoted" to walk down the aisle, she slipped and fell. *Id.* at 547. The plaintiff and her companion testified that they did not observe what caused her to fall at the time of the incident. *Id.* One of the theater's employees testified that he cleaned the theater prior to the showing of the movie plaintiff watched, and inspected the area approximately 5 to 10 minutes after the fall and did not observe anything on the floor. *Id.* The Alabama Supreme Court found summary judgment was appropriate because the plaintiff had not provided substantial evidence there was debris on the floor that caused her to fall and had only provided evidence that she slipped and fell. *Id.*

Here, like the plaintiff in *Whiteside*, the Jacksons testified that neither of them observed anything on the floor following Mrs. Jackson's fall.[62] In addition, Mr. Rowe testified that he inspected the area and did not find anything on the floor where Mrs. Jackson fell[63]:

> Q.    So when you were on the ground feeling around, you did not feel
>        any wet or slippery substance?
>
> A.    No, I did not feel nothing.
>
> Q.    Did you see any popcorn?
>
> A.    No. It was clean.
>
> Q.    There was no liquid?

---

[61] This issue is addressed in detail in Defendant's Motion in Limine to Limit Plaintiffs' Neil Opfer. Defendant incorporates its arguments in its Motion in Limine into the instant motion.

[62] Deposition of Carol Jackson, Vol. II, 136:23–25; 137:1–9, Exhibit B; Deposition of Thomas Jackson, 24:6–12, Exhibit F.

[63] Deposition of Scott Rowe, 37:13-22, 45:7–13; 50:19–25; 51:1–25; 52:1–23, Exhibit G.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

1    A.      No liquid.  No popcorn.

2    Q.      No sticky stuff?

3    A.      No. Nothing.[64]

4

5    Not only did Mr. Rowe visually inspect the floor and seating, he also got down on his

6    hands and knees and felt the surface of the floor for the presence of debris or foreign substances.[65]

7    Later that evening, Mr. Amico, Rainbow Promenade's General Manager, also inspected

8    Auditorium 7 and found no debris or foreign substances present.[66]  In short, there is no evidence

9    in this case that anyone who went into the theater after Mrs. Jackson's fall identified a foreign

10   substance on the floor where Mrs. Jackson allegedly fell.

11   Plaintiffs' opposition to this Motion will argue that there are genuine issues of material

12   fact regarding: 1) whether the photograph points to a foreign substance; and 2) whether Mr. Rowe

13   saw or felt anything on the floor of the auditorium following the incident. More specifically,

14   Plaintiffs will argue the investigative report drafted by Brad Greene of Liberty Mutual Insurance

15   Company on January 29, 2009[67], states that Mr. Rowe felt a wet or slippery substance on the

16   floor. The report states Mr. Rowe:

17
          reached down and felt the floor and found what he described as "maybe a
18
          little butter slop" but there was really nothing there. Mr. Rowe states the
19
          usher also went in with him and they took a photo with the usher's camera
20
          phone to show the area…He states he went back into the auditorium and
21
          again looked at the area and said there was really nothing on the floor…[68]
22

23   [64] Deposition of Scott Rowe, 37:13-22, Exhibit G.

24   [65] Deposition of Scott Rowe, 14:5–21, 22:11–25, 23:1–4, 23:17–20, 33:7–12, 36:22–25, 37:1–22, 40:8–11, 42:24–25, 43:1–25, 44:1–4, 54:5–13, Exhibit G.

25   [66] Deposition of Jeffrey Amico, 12:19–25; 13:1–16, Exhibit I.

26

27   [67] Attached as **Exhibit N.** This report is inadmissible as it has not been authenticated and contains inadmissible hearsay within hearsay.

28   [68] Exhibit N, p. 2-3.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

1

2          Nonetheless, during his deposition, Mr. Rowe read the investigative report and adamantly

3   denied that he felt a wet or slippery substance on the floor as written in the report.[69] In addition,

4   Plaintiffs will argue Ms. Mason hearsay testimony that after the incident occurred and the

5   Jacksons had left, her, Ms. Clanton, and Mr. Rowe were in the manager's office and Mr. Rowe

6   told her he felt something under one of the seats:

7

8          Q.      You said he felt something under the some seat?

9          A.      He turned on the lights and he said he saw something that was

10                 underneath the seats in the general area she had described from

11                 where she fell and where she showed him she fell.  He said in there

12                 he was like directly under the seat…He said in his opinion that he's

13                 like, I don't know how she fell because you would have had to put

14                 your foot under the seat to slip on that.  He said it was so small

15                 underneath the seat, he's like it's almost impossible.  It would just

16                 be walking in the aisle and slip on it.[70]

17

18         However, even if Plaintiffs are given the benefit of the doubt that any of this evidence

19   would be admissible, the photograph pointed to a foreign substance, and Mr. Rowe did actually

20   find something on the floor, none of this creates an issue of material fact so as to defeat the

21   instant Motion for Summary Judgment. First, the photograph points to the floor below the first

22   seat on the right hand entrance of the row (when facing the screen) because the edge of the aisle

23   carpet is shown at the bottom of the photograph. However, Mrs. Jackson testified that she slipped

24   when she was in the middle of the eight seat row—not upon first entering the row.[71] Likewise,

25   Mr. Jackson testified that, when facing the screen, Mrs. Jackson's seat was at least two to three

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

26  _____

27  [69] Deposition of Scott Rowe, 14:7-25, Exhibit G.

    [70] Deposition of Amber Mason, 45:4-24, 46:2-14, Exhibit E.

28  [71] Deposition of Carol Jackson, Vol. I, 102:3-9, Vol. II, 123:23-25, 124:1, Exhibit B.

1   seats towards the middle of the eight seat row.[72] Thus, even if the photograph was admissible and

2   pointed to a foreign substance—which Defendant denies—the photograph does not even depict

3   where Mrs. Jackson testified she fell.

4          Further, neither the investigative report, nor Ms. Mason's testimony identifies that any

5   foreign substance was found *where* Mrs. Jackson said she fell. Rather, the investigative report

6   corroborates Mr. Rowe's testimony that he does not believe there was anything on the floor in the

7   area where Mrs. Jackson allegedly fell. None of this evidence establishes that a dangerous

8   condition existed at the time of Mrs. Jackson's fall.

9          As Plaintiffs cannot create a genuine issue of material fact that an unknown substance

10   caused her to fall as neither Mrs. Jackson nor Mr. Jackson ever saw or felt any substance on the

11   floor, Defendant United Artists respectfully requests that this Court grant its Motion for Summary

12   Judgment.

13

14          **2.      Plaintiffs can produce no evidence that Defendant had actual or constructive**

15                 **notice of any dangerous condition in existence at the time of Mrs. Jackson's**

16                 **fall**

17          Assuming arguendo that Plaintiffs could produce evidence to create a material issue of

18   fact regarding the existence of a foreign substance where Mrs. Jackson fell, Plaintiffs must also

19   establish that Defendant had actual or constructive notice that the unsafe condition existed.  In

20   premises liability cases involving foreign transitory substances, as here, "[w]here the foreign

21   substance is the result of the actions of persons other than the business or its employees, liability

22   will lie only if the business had actual or constructive notice of the condition and failed to remedy

23   it." *Sprague v. Lucky Stores, Inc.*, 109 Nev. 247, 250 (1993); *see also Buehler v. Alpha Beta Co.*,

24   224 Cal. App. 3d 729 (Cal. App. 1990) ("If the condition could not be seen, recognized or

25   measured, the defendant would have no opportunity to take any remedial measures to abate the

26   hazard."). In addition, "[i]f one slips and falls because of it, liability may be found if the condition

27

28   [72] Deposition of Thomas Jackson, 18:24-25, 19:1-8, Exhibit F.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

1   was created by the proprietor or his agent or, if created by another, the proprietor had actual or

2   constructive notice of its existence."*Asmussen v. New Golden Hotel Co.*, 80 Nev. 260, 262

3   (1964).

4           In *Sprague, supra*, the plaintiff allegedly slipped and fell in the produce section of a

5   grocery store on a grape. During discovery, the defendant grocery store's employees testified that

6   there was frequently produce on the floor and that the produce area was a high-risk for falls

7   because produce was continually falling on the floor. Although the plaintiff provided no evidence

8   that the defendant created the condition or that the defendant had actual knowledge of the

9   condition, the Court reversed the dismissing of the case finding that whether the store had

10  constructive knowledge was a question of fact for the jury because:

> [a] reasonable jury could have determined that the virtually continual debris
> on that produce department floor put Lucky on constructive notice that, at any
> time, a hazardous condition might exist which would result in an injury to
> Lucky customers.

13  *Sprague v. Luck Stores, Inc.*, 109 Nev. at 251, 849 P.2d at 323 (1993).

14          The instant case involving a movie theater auditorium, however, is a far cry from a

15  bustling produce aisle. The evidence shows that *No Country for Old Men*[73] had very few patrons

16  on the day in question—only 15 people at the 1:30 p.m. show and 10 people, including the

17  Jacksons, at the 4:20 p.m. show. The low volume of attendance coupled with the fact there had

18  only been two other reported slips in auditoriums at the Rainbow Promenade in the previous five

19  years—both over two years before and neither occurring in the seating rows—could not have

20  placed Defendant on constructive notice that a more strenuous cleaning program was warranted.

21          Although unreported, *Henschel v. United Artists Theatre Circuit, Inc.* addressed a similar

22  situation where a plaintiff attempted to establish the defendant had constructive notice of a

23  substance on a stairwell of a movie theater. 2006 WL 1113329 (Mich.App.).[74] In *Henschel*, the

24  plaintiff was walking down the stairs of defendant's movie theater prior to the movie starting and

25  claimed to have slipped and fallen on an unknown sticky and wet substance. *Id.* at *1–2. After

---

[73] This was the movie's second release after it won an Academy Award for "Best Picture."

[74] Attached as **Exhibit O**.

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

1   Henschel fell, her hands were wet and sticky from the substance that smelled like popcorn and

2   butter. *Id.* at *2.  The Court found that where the plaintiff allegedly felt the wet and sticky

3   substance when she fell, she created a genuine issue of material fact that the substance caused her

4   fall. *Id.* at *3.  However, the court also found that this alone was not enough to survive summary

5   judgment because there was no evidence defendant's employees had actual or constructive

6   knowledge of the liquid on the step, nor did the employees create the condition. *Id.* at *5.

7           Likewise, in *Jones v. AMC Bay Plaza Cinema 13*, the plaintiff allegedly slipped and fell

8   on a greasy substance, popcorn, or candy while walking in an aisle at the defendant's theater

9   while the previews were in progress. 824 N.Y.S.2d 755 (N.Y.Supp. 2006).  The defendant's

10  manager testified that ushers cleaned and inspected theaters between showings and swept and

11  mopped as time permitted. *Id.* at *1. While the defendant did not provide any documentation or

12  evidence showing what ushers worked in that theater on that day, the court affirmed summary

13  judgment because it found that the defendant theater established that the theater had been cleaned

14  prior to plaintiff's fall and plaintiff did not adequately refute it. *Id.* at *4.

15          Here, even had the Jacksons felt or seen a substance, they have not established United

16  Artists had notice of any dangerous condition. First, there is no evidence that United Artists or

17  any of its employees created a dangerous condition or had actual notice prior to Mrs. Jackson's

18  fall. In addition, Plaintiffs have not presented any evidence that this alleged substance could have

19  been on the floor for an unreasonable amount of time.

20          Further, United Artists employs a comprehensive custodial program to keep the Rainbow

21  Promenade auditoriums clean, which involves an extensive nightly cleaning after the theater

22  closed; a morning inspection prior to opening; two theater checks while each movie is playing;

23  and an inspection and cleaning after each movie concludes. Plaintiffs have not presented any

24  evidence that United Artists' policies were inadequate or were not followed on the day of the

25  incident. Finally, Plaintiffs cannot present any evidence that—even had there been something on

26  the floor—it was there for an unreasonable amount of time. Plaintiffs are unable to present

27

28

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN ROAD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

1   evidence concerning how long the alleged foreign substance existed prior to Mrs. Jackson's fall,[75]

2   and therefore cannot impute constructive notice on United Artists.

3        In order to recover, Plaintiffs must establish that not only was there was a dangerous

4   condition, but that United Artists had actual or constructive knowledge of that condition and

5   failed to remedy it. At trial, Plaintiffs will not be able to meet their burden of demonstrating to a

6   jury that United Artists created the alleged dangerous condition or that United Artists had actual

7   or constructive knowledge of said condition. As such, there are no genuine issues of material fact

8   regarding United Artists' notice which would preclude summary judgment. *See Asmussen*, 80

9   Nev. at 262, 392 P.2d at 50 (1964); *Sprague v. Lucky Stores, Inc.,* 109 Nev. at 250, 849 P.2d at

10  322-323 (1993).  United Artists respectfully requests this Honorable Court grant the instant

11  Motion for Summary Judgment.

12  / / /

13  / / /

14  / / /

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

---

[75] *No Country for Old Men* has a 122 minute runtime. On the day of the incident, the previous showing started at 1:30 pm. As mere example for the purposes of the instant Motion, estimating that the previews for the movie were approximately 12 to 15 minutes, *see* Deposition of Amber Mason, 47:2-4, the first showing finished approximately between 3:44 and 3:47 pm. The usher then conducted a walkthrough and cleaning of the theater and notified the ticket taker that patrons could be seated. This would have taken at least another 5 to 10 minutes, meaning the theater was at the earliest open for patrons to come in from 3:49 and 3:57 pm. Because Mrs. Jackson's fall occurred during the "twenty"—the commercials for the twenty minutes before the movie previews start—the Jacksons arrived in the auditorium sometime between 4:00 pm and 4:20 pm. Again, assuming a foreign substance was actually on the floor, this leaves a mere 3 to 31 minute window from the last time the theater was inspected to when the fall occurred. There is no evidence anything was on the floor for an unreasonable amount of time.

### IV. CONCLUSION

Based on the foregoing argument, Defendant respectfully requests this Court exercise its discretion and grant summary judgment in its favor.


BARRON & PRUITT, LLP


David Barron, Esq.
Nevada Bar No. 0142
Chelsea Pyasetskyy, Esq.
Nevada Bar No. 11688
3890 West Ann Road
North Las Vegas, NV  89031
*Attorneys for Defendants*
*United Artists Theatre Circuit, Inc.*

## LIST OF EXHIBITS

A.    *Injurious Falls Among Middle Aged and Older Adults With Multiple Sclerosis*, Elizabeth W. Peterson, MPH, OTR/L, et. al., Arch. Phys. Med. Rehabil. Vol. 89, June 2008, 1031

B.    Deposition of Carol Jackson, with Exhibits A and B attached.

C.    Plaintiff Carol Jackson's Answers to Interrogatories

D.    Regal Showtime Summary for February 28th and 29th, 2008, Bates Numbered REGAL004106-REGAL4108.

E.    Deposition of Amber Mason

F.    Deposition of Plaintiff Thomas Jackson, with Exhibit G attached.

G.    Deposition of Scott Rowe

H.    Deposition of Crystal Clanton

I.    Deposition of Jeffery Amico

J.    Subject photograph

K.    Defendants Answers to Interrogatories

L.    Usher Certification: Training Program & Certification for the Regal Entertainment Group, Bates Numbered 4077-REGAL4092.

M.    Regal Entertainment Group's claim details for the above incidents, previously produced as REGAL004094-REGAL004097

N.    Liberty Mutual Investigative Reports, Bates Numbered REGAL4109-REGAL4122, Social Security Numbers Redacted

O.    *Henschel v. United Artists Theatre Circuit, Inc.*, 2006 WL 1113329 (Mich.App.).

P.    Manager's Opening Checklist, Bates Numbered REGAL004093.

Q.    Incident Report

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 13th day of June, 2011, I deposited the foregoing

**DEFENDANT UNITED ARTISTS' MOTION FOR SUMMARY JUDGMENT** in the United

States Mail, postage prepaid, addressed to the following:

*Facsimile: 702-685-9412*
Dan Winder, Esq.
Law Office of Dan M. Winder, PC
3507 W. Charleston Blvd.
Las Vegas, Nevada  89102
*Attorney for the Plaintiffs*

_____
An Employee of BARRON & PRUITT, LLP

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN RD.
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950